[Cite as *State v. Davis*, 2025-Ohio-3126.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. Kevin W. Popham, P.J. |
|  | : | Hon. Craig R. Baldwin, J. |
| Plaintiff-Appellee | : | Hon. David M. Gormley, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2024 AP 09 0032 |
| JERRY DAVIS | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |


CHARACTER OF PROCEEDING:      Appeal from the Tuscarawas County Court
of Common Pleas, Case No.
2024 CR 01 0001

JUDGMENT:      Affirmed


DATE OF JUDGMENT ENTRY:      August 29, 2025


APPEARANCES:

For Plaintiff-Appellee

KRISTINE BEARD
Assistant Prosecutor
125 East High Avenue
New Philadelphia, OH 44663

For Defendant-Appellant

DANN GUINN
232 West 3rd Street
Suite 312
Dover, OH 44622

*Popham, P.J.*

{¶1}   Appellant Jerry Davis appeals the judgment entered by the Tuscarawas County Court of Common Pleas following a jury trial.  Appellee is the State of Ohio.  For the reasons below, we affirm.

*Facts & Procedural History*

{¶2}   Appellant was indicted on one count of felonious assault, in violation of R.C. 2903.11(A)(1), a felony of the second degree.   On April 24, 2024, trial counsel for appellant filed a motion to continue the jury trial, as counsel was unsure of appellant's whereabouts.   The trial court issued a judgment entry continuing the trial and ordering appellant to appear for a pretrial hearing on April 26, 2024.  Appellant failed to appear for the pretrial.   The trial court issued a capias, due to appellant's failure to comply with pretrial supervision and revoked appellant's bond.

{¶3}   On April 29, 2024, appellant was arrested and held without bond.  His jury trial began on July 23, 2024.  The following testimony is adduced from the trial record.

{¶4}   Cheryl Walker ("Walker"), who is a friend of appellant and girlfriend of the victim, J.C., testified as follows:  On the night of December 28, 2023, appellant, J.C., and Walker were at Walker's home, drinking together.  Appellant spoke to Walker in a hushed tone.   J.C. believed appellant was "flirting" with Walker, so J.C. became upset and slapped, or smacked, appellant across the face.  Several minutes later, appellant pushed J.C. down and began kicking J.C. in the head.  Initially, J.C. did not seek medical care. However, J.C. developed facial swelling, and the following day began having seizures. On December 30, 2023, J.C. went to the hospital.

{¶5}    Walker's daughter, Heather Lippencott ("Lippencott"), testified as follows: Walker and J.C. are both alcoholics.  On December 28, 2023, Walker, J.C., and appellant were drinking together for several hours.  Lippencott stated that Walker, J.C., and appellant were all intoxicated, but she was not.  Lippencott described how appellant began flirting with Walker, which J.C. did not like.  Thus, when J.C. was returning from getting a beer, he "slapped [appellant] in the face."  Lippencott described the slap as "not that hard at all" and "not strong enough" to cause appellant any physical harm or injury.

{¶6}    Several minutes later, appellant "went over and pushed [J.C.]."  Lippencott testified, "[J.C.] fell down.  I don't know if he hit the steps or not.  But then [appellant] started kicking [J.C.] in the face and head."  Lippencott saw appellant kick J.C. in the head four or five times, and described the assault to officers as appellant "curb stomping" J.C.  Lippencott confirmed appellant was barefoot when he was kicking J.C., but she testified appellant kicked J.C. so hard that J.C. was "knocked out."  When appellant stopped kicking J.C., Lippencott tried to wake up J.C.  Appellant told Lippencott he should not have hit J.C. and told J.C. he was sorry.  Lippencott told everyone to leave, but J.C. stayed because he was "not quite conscious enough to be able to go anywhere at that point anyways."

{¶7}    Lippencott did not call police because "things like this have happened at my mom's house before and [J.C.] was awake and conscious enough to my ability that I didn't think that I needed to do that … and I really didn't want myself involved in it."  On cross-examination, Lippencott testified that within a four-hour period, she had about 6-8 shots [of alcohol].  Despite this, she did not believe she was drunk, and she was able to drive herself home.

{¶8}  J.C. is fifty-two years old.  He testified that he drinks a lot and has been in many fights.  He met appellant at a shelter.  J.C. could not remember if he slapped or smacked appellant on the night of December 28, 2023.  However, J.C. remembered talking to appellant when appellant "came and just stormed at me" continuing "I fell on the floor, and he starts stomping me."  J.C. is unsure how many times he got stomped or if he lost consciousness.  J.C. thought someone had called the police that night, but he did not make the call.  J.C. testified that, after the incident, he initially felt "pretty bad."  As time went on, he started having seizures.  Eventually, he ended up at the hospital; however, J.C. has no recollection of being taken from Walker's house to the hospital.  J.C. did not remember most of what occurred at the hospital because he was on so much medication.  J.C. testified that, between December 28, 2023, and when he went to the hospital on December 30, 2023, he did not get into an altercation with anyone else and he did not fall.

{¶9}  On cross-examination, J.C. testified that he, Walker, and appellant were intoxicated that night – December 28, 2023.  However, J.C. stated that Lippencott was not intoxicated and "she's the only one that had the level head."  Before this incident, J.C. had previously gone to the hospital after falling and was diagnosed with a brain bleed.  He was also assaulted by other individuals several months before December 28, 2023.  J.C. again confirmed on cross-examination that he did not fall or suffer any other trauma between December 28, 2023, and when he went to the hospital on December 30, 2023.

{¶10}  Walker testified she "drinks a lot."  Walker admitted that she and J.C. had "too much to drink" on the night of December 28, 2023.  However, she testified Lippencott "was not drunk."  On December 28, 2023, appellant whispered something in her ear.  J.C.

hit appellant in the face after witnessing appellant whisper to Walker; however, Walker stated J.C. did not hit appellant hard enough to cause injury. Walker then went to her bedroom to roll cigarettes. She heard a commotion and saw Lippencott trying to get appellant off J.C., who was still on the floor. When appellant let J.C. up, J.C. sat in a chair, and appellant stated, "I'm sorry brother." Walker testified Lippencott did not have to pick J.C. up and carry him to a chair.

{¶11} Initially, Walker did not see any marks on J.C. However, the next day, J.C.'s face became swollen. Walker did not call an ambulance; rather, she called J.C.'s niece and brother, who called the ambulance. Walker testified she did not call an ambulance on December 28, 2023, because J.C. told her not to do so. Walker testified on cross-examination that, if J.C. had been seriously injured, she would have called an ambulance.

{¶12} Walker stated that J.C. had been in other fights at her home. However, Walker testified that J.C. did not fall and was not involved in any fights between the incident on December 28, 2023, and when J.C. went to the hospital on December 30, 2023.

{¶13} Officer Jena Dugan ("Dugan") testified as follows: Dugan saw J.C. the night of the incident. Dugan testified that J.C. had a reputation for drinking. Appellant told Dugan he "took a boot to [J.C.'s] head." Dugan did not see any visible injuries on J.C. However, J.C. had his hood up, so she could not see his face and could not tell if his face was swollen.

{¶14} J.C.'s niece and brother called the police on December 30, 2023. When Seargent Mitchell Gobely ("Gobely") arrived, J.C. had already been taken to the emergency room. The medical staff informed Gobely that J.C. suffered blunt force trauma

to the head. Appellant waived his Miranda rights and told Gobely that J.C. smacked and hit him, so he hit J.C. a few times, and, while barefoot, stomped J.C. once on the head. Gobely described appellant's story as "inconsistent", because appellant stated both that he recalled the whole incident and that he could not remember the whole incident.

{¶15} Dr. Jeremy King ("King"), an emergency room physician at Dover Union Hospital, testified about J.C.'s injuries. When J.C. arrived at the emergency room, he had visible injuries, which consisted of facial trauma and bruising of the chest and extremities. J.C. was paralyzed on his left side and had seizures. A CAT (Computerized Axial Tomography) scan of J.C.'s head showed a collection of fluid on the right side of his brain. King diagnosed J.C. with a subdural hematoma, which King defined as bleeding in between the skull and underneath the lining of the brain. King categorized J.C.'s subdural hematoma as "life threatening" because it could lead to permanent damage or death.

{¶16} King testified that J.C.'s subdural hematoma appeared to be caused by blunt force trauma, i.e., being punched, kicked, or hit. When asked how long it would take for symptoms of the subdural hematoma to develop, King stated it varies, depending on the size of the bleed. While some individuals have symptoms immediately, other individuals do not have symptoms for several days. King testified that J.C. had both an acute subdural hematoma (new blood in the brain), which occurred within three days prior to the CAT scan taken on December 30, 2023, and a chronic subdural hematoma (old blood in the brain), which occurred over twenty-one days prior to the imaging.

{¶17} While still an in-patient but after leaving the emergency room, J.C. had another seizure, so King intubated and transferred J.C. to Akron General Hospital, where he underwent a middle-meningeal artery embolization to stop the brain bleeding and

decrease the pressure in his brain. J.C. remained hospitalized for approximately two weeks.

{¶18} J.C.'s hospital toxicology screen was positive for alcohol, cocaine, and marijuana. King testified that, even without the chronic subdural hematoma (old blood in the brain) and without the drugs and alcohol in his system, J.C. still would have been in danger of dying, still would have needed surgery, and still would have had a prolonged hospital stay. King confirmed that an acute subdural hematoma would be an injury consistent with an individual pushing J.C. to the ground and stomping on his head five times in socks on December 28, 2023. King testified that, due to the degree of facial swelling, J.C.'s injuries were not consistent with a fall. On cross-examination, King testified he could not definitively state whether the hematoma was caused by being kicked or hit in the head, but could, with certainty, state it occurred within three days prior to the December 30, 2023, CAT scan. King also stated that, given the nature of J.C.'s injuries, it appeared to him that J.C. sustained more than one hit to the head.

{¶19} Appellant testified on his own behalf and provided the following: Appellant had multiple drinks before going to Walker's house on December 28, 2023, and had several beers and shots while at Walker's house. Appellant described himself as having "a pretty good buzz on", described the scene stating, "we were all pretty intoxicated", and that he, J.C., and Walker were "blitzed." According to appellant, when he spoke to Walker, J.C. got angry, threatened to kill appellant, and then hit appellant on the ride side of the face. Appellant retaliated because he was afraid. Appellant told the officer he "lit [J.C.] up." Appellant testified he was scared and wanted to make sure J.C. did not hit him anymore because J.C. is an "angry drunk." Appellant recalled hitting J.C. in the kidneys,

on the head, and kicking him once, while barefoot.  Appellant denied kicking J.C. repeatedly.

{¶20}  Appellant apologized to J.C.  When appellant left Walker's house, J.C. was fine and was talking to appellant.  Appellant returned later, and J.C. was still in good condition, although he had "a little swelling on his head."  Appellant testified it was not his intention to cause serious physical injury to J.C. because J.C. is his friend.

{¶21}  On July 25, 2024, the jury returned a guilty verdict.  On July 26, 2024, the trial court issued a judgment entry memorializing the jury's guilty verdict, ordering a presentence investigation, and setting a sentencing date.

{¶22}  On September 17, 2024, the trial court held a sentencing hearing.  Appellee argued for a prison sentence.  Counsel for appellant argued for substance abuse treatment and community control, citing appellant's serious substance abuse issues and his lack of previous felony convictions.  Appellant spoke on his own behalf and apologized for his actions.

{¶23}  The trial court sentenced appellant to an indefinite prison term of four to six years.  The court noted the presumption of a prison sentence for a felony of the second-degree.  In support of the sentence, the trial court cited the following:  the injury to the victim was worsened because of the physical condition of the victim; the victim suffered serious physical harm, resulting in ICU hospitalization; the offender has a significant misdemeanor history, with 14 convictions for disorderly conduct, 15 convictions for contempt of court, 2 convictions for assault, 2 convictions for menacing, and 2 convictions for trespass; the offender failed to respond favorably in the past to sanctions imposed for these criminal convictions; the offender has demonstrated a pattern of drug or alcohol

abuse, including abusing marijuana, hallucinogens, alcohol, methamphetamine, cocaine, heroin, and bath salts; the offender's substance abuse assessment indicated several diagnoses, including alcohol use disorder (moderate), amphetamine-type substance disorder (mild), cannabis use disorder (moderate), and cocaine use disorder (moderate); the offender demonstrates a high risk of reoffending pursuant to the Ohio Risk Assessment System; and the offender was not compliant with the terms of his bond, resulting in a capias being issued for his arrest.

{¶24} In the September 17, 2024, judgment entry, the trial court stated it considered the purposes and principles of sentencing contained in R.C. 2929.11, and the balance of seriousness and recidivism factors under R.C. 2929.12.

{¶25} Appellant appeals from the September 17, 2024, judgment entry of the Tuscarawas County Court of Common Pleas, and assigns the following as error:

{¶26} "I. APPELLANT'S CONVICTION FOR FELONIOUS ASSAULT WAS NOT SUPPORTED BY EITHER THE LEGALLY SUFFICIENT EVIDENCE OR THE WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL."

{¶27} "II. THE TRIAL COURT ERRED WHEN IT IMPOSED A PRISON SENTENCE AS OPPOSED TO COMMUNITY CONTROL UPON APPELLANT."

I.

{¶28} In his first assignment of error, appellant contends appellee failed to present sufficient evidence to support the conviction and that the conviction is against the manifest weight of the evidence. Appellant attacks the jury's finding of guilt on the basis of alleged inconsistencies in the trial testimony, the level of intoxication of the witnesses, and the alleged failure by appellee to prove appellant caused serious physical harm.

*Standards of Review*

{¶29} "When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed, but, rather, whether the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Pountney*, 2018-Ohio-22, ¶ 19, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. A "verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997).

{¶30} In determining whether a conviction was against the manifest weight of the evidence, an appellate court acts "as a 'thirteenth juror' and after 'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be [reversed] and a new trial ordered.'" *State v. Hane,* 2025-Ohio-120, ¶ 20 (5th Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The reversal of a conviction on manifest-weight grounds should occur only in "the 'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*

{¶31} "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to

their verdict, if, on weighing the evidence, in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them.'" (Emphasis in original.) *Thompkins* at 387. "[A]n appellate court will leave the issues of weight and credibility of the evidence to the factfinder, as long as a rational basis exists in the record for its decision." *State v. Sheppard*, 2025-Ohio-161, ¶ 66 (5th Dist.).

*Alleged Inconsistencies in Trial Testimony*

{¶32} Appellant attacks the jury's finding of guilt on the basis of alleged inconsistencies in the testimony of the witnesses. He contends that, due to these inconsistencies, there is reasonable doubt as to whether he caused J.C. serious physical harm and, thus, his conviction is against the manifest weight and sufficiency of the evidence.

{¶33} To prove the R.C. 2903.11(A)(1) felonious assault charge, appellee was required to introduce evidence that appellant knowingly, "cause[d] serious physical harm to another or another's unborn." R.C. 2903.11(A)(1). R.C. 2901.01(A)(5) defines "serious physical harm to persons" as "… (b) [a]ny physical harm that carries a substantial risk of death; (c) [a]ny physical harm that … involves some temporary, substantial incapacity … (e) [a]ny physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain."

{¶34} Appellant contends the following inconsistencies in the witnesses' trial testimony demonstrate his conviction is against the manifest weight and sufficiency of the evidence: J.C. denied flirting with Walker, but Lippencott and Walker testified J.C. was flirting with Walker; J.C. did not recall slapping appellant, but Lippencott testified J.C. slapped appellant; Walker testified that no one helped J.C., but Lippencott testified she

helped J.C. after appellant hit and kicked him; Walker testified J.C. was not unconscious, but Lippencott testified J.C. was unconscious; and there were discrepancies as to whether the fight was mutual.

{¶35} Even with the minor discrepancies in the testimony of the witnesses, all the witnesses, including appellant, remember appellant knocked or pushed J.C. to the ground, and stomped on his head. Walker and Lippencott testified appellant kicked J.C. in the head multiples times. The testimony of the witnesses largely corroborates each other's version of the incident. Further, even if inconsistent testimony had been presented, "while a jury may take note of inconsistencies and resolve or discount them accordingly, such inconsistencies alone do not render a conviction against the manifest weight or sufficiency of the evidence." *State v. Wolters*, 2022-Ohio-538, ¶ 20 (5th Dist.). Here, any inconsistencies do not rise to the level wherein the evidence weighs heavily against conviction.

{¶36} As to any inconsistencies or discrepancies about whether the fight was mutual, this Court has previously stated, "this Court is unable to locate any evidence that mutual combat as a defense exists in the State of Ohio." *Matter of T.S.*, 2022-Ohio-975, ¶ 47 (5th Dist.); see also *State v. Lynch*, 2011-Ohio-3062, ¶ 16 (8th Dist.). Further, even in a non-competitive mutual combat situation, a party to the fight may be found guilty of felonious assault where the harm to one of the fighters constitutes serious physical harm. *State v. McCurdy*, 2013-Ohio-5710, ¶ 21 (10th Dist.); *State v. Dunham*, 118 Ohio App.3d 724, 730 (1st Dist. 1997). The testimony of King establishes J.C. suffered serious physical harm.

{¶37} Appellant next argues that because no one called the police or an ambulance on the night of December 28, 2023, and because similar incidents had occurred before at Walker's home, his conviction is against the manifest weight and sufficiency of the evidence. However, Lippencott and Walker testified they did not call the police because J.C. asked them not to, and, further, that they did not call an ambulance because J.C. did not immediately show signs of serious injury. Simply because the police were not called until several days later is not dispositive of whether there is sufficient evidence to convict appellant of felonious assault. Additionally, the undisputed testimony is that while appellant did not show signs of severe injury on the night of the incident, he began to have facial swelling and seizures that worsened over several days. King explained the timing of the facial swelling and seizures is consistent with J.C.'s acute subdural hematoma, as it can take up to three days for symptoms of an acute hematoma to appear.

*Intoxication*

{¶38} Appellant also contends his conviction is against the manifest weight and sufficiency of the evidence due to the level of intoxication of the witnesses to the incident. Specifically, appellant contends the jury should not have found Lippencott's testimony credible because she had multiple alcoholic drinks on the night of December 28, 2023.

{¶39} "A witness' intoxication is one of many factors that may be weighed by the jury in assessing credibility. It may provide appropriate fodder for cross-examination. It does not, however, render the witness' testimony per se incredible." *State v. Miller*, 2017-Ohio-7986 ¶ 21 (6th Dist.); *State v. Bailey*, 2012-Ohio-3955, ¶ 11 (8th Dist.) (rejecting appellant's argument that conviction was against the manifest weight of the evidence due

to intoxication of the eyewitness).  Rather, the weight of the testimony must still be considered by the trier of fact.  *State v. DeHass*, 10 Ohio St.2d 227, 230 (1967).  J.C. testified Lippencott was the only one on the night of December 28, 2023, who "had a level head" and "was not intoxicated."  Walker testified Lippencott "was not drunk" that night.

{¶40}  On cross-examination, trial counsel for appellant questioned Lippencott about her drinking.  Lippencott testified that while she had a number of shots during a four-hour period, she did not believe she was drunk, and she was able to drive herself home.  She was also able to recall specific details of the incident between appellant and J.C., and her recollections were consistent with the injuries J.C. sustained.  While it was appropriate for the defense to explore the topic during cross-examination, the jury ultimately found Lippencott's testimony credible.  The jury's decision that Lippencott's testimony was credible despite her level of intoxication did not render appellant's conviction against the manifest weight or sufficiency of the evidence.

*Serious Physical Harm*

{¶41}  Appellant cites King's testimony - that he could not definitively state whether J.C.'s acute subdural hematoma was caused by being kicked or hit in the head - for the proposition that his conviction is against the manifest weight and sufficiency of the evidence, because J.C.'s injuries could have been caused by J.C. falling and hitting his head on the sidewalk.  Appellant does not dispute that J.C. sustained serious physical harm; rather, he argues the evidence was not sufficient to demonstrate that appellant actually caused serious physical harm.  However, King confirmed an acute subdural hematoma would be an injury consistent with an individual pushing J.C. to the ground and stomping on or kicking his head.  Additionally, King specifically testified that, due to

the degree of J.C.'s facial swelling, J.C.'s injuries were not consistent with a fall. Further, both J.C. and Walker testified that, between December 28, 2023, and December 30, 2023, J.C. did not fall or get into an altercation with anyone else.

{¶42} Appellant additionally states that King "could not determine the timing or cause of [J.C.'s] injuries." King's testimony directly contradicts this assertion. King specifically testified that the acute subdural hematoma occurred within three days prior to December 30, 2023, and that the injuries suffered by J.C. were caused by "blunt force trauma." The testimony of King demonstrates the severity of the trauma appellant inflicted upon J.C. after appellant pushed J.C. to the ground and stomped on, or kicked, J.C.'s head.

{¶43} The jury was in the best position to determine the credibility of the witnesses. We find, viewing the evidence in the light most favorable to the prosecution, the jury could find that appellant caused serious physical harm to J.C.

*Conclusion – Manifest Weight & Sufficiency of the Evidence*

{¶44} After viewing the evidence in a light most favorable to the prosecution, we find a rational trier of fact could have found the essential elements of the crime of felonious assault beyond a reasonable doubt. Further, this is not the case where the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered. The jury verdict finding appellant guilty of felonious assault was not against the manifest weight or sufficiency of the evidence. Appellant's first assignment of error is overruled.

II.

{¶45} In his second assignment of error, appellant contends the trial court committed error when it imposed a prison sentence as opposed to a community control sanction.

{¶46} We review felony sentences using the standard of review set forth in R.C. 2953.08. *State v. Marcum*, 2016-Ohio-1002. R.C. 2953.08 provides we may either increase, reduce, modify, or vacate a sentence and remand for sentencing where we clearly and convincingly find either the record does not support the sentencing court's findings under R.C. 2929.13(B) or (D), R.C. 2929.14(B)(2)(e) or (C)(4), or R.C. 2929.20(I), or the sentence is otherwise contrary to law. *Id.*

{¶47} Nothing in R.C. 2953.08 permits this Court to independently weigh the evidence in the record and substitute our own judgment for that of the trial court to determine a sentence which best reflects compliance with R.C. 2929.11 and R.C. 2929.12. *State v. Jones*, 2020-Ohio-6729. Instead, we may only determine if the sentence is contrary to law. A sentence is not clearly and convincingly contrary to law where the trial court "considers the principles and purposes of R.C. 2929.11, as well as the factors listed in R.C. 2929.12, properly imposes post-release control, and sentences the defendant within the permissible statutory range." *State v. Pettorini*, 2021-Ohio-1512, ¶ 16 (5th Dist.).

{¶48} When sentencing a defendant, the trial court must consider the purposes and principles of felony sentencing set forth in R.C. 2929.11, and the seriousness and recidivism factors in R.C. 2929.12. *State v. Taylor*, 2024-Ohio-238 (5th Dist.).

{¶49} "The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." R.C. 2929.11(A). To achieve these purposes, "the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both." *Id.* Further, the sentence imposed shall be "commensurate with and not demeaning to the seriousness of the offender's conduct and its impact on the victim, and consistent with sentences imposed for similar crimes by similar offenders." R.C. 2929.11(B).

{¶50} R.C. 2929.12 lists general factors which must be considered by the trial court in determining the sentence to be imposed for a felony, and gives detailed criteria, which do not control the court's discretion, but which must be considered for or against severity or leniency in a particular case. R.C. 2929.12 sets forth that the trial court retains discretion to determine the most effective way to comply with the purposes and principles of sentencing as set forth in R.C. 2929.11.

{¶51} Here, the trial court's September 17, 2024, judgment entry confirms that the court considered the principles and purposes of felony sentencing under R.C. 2929.11 and balanced the seriousness and recidivism factors under R.C. 2929.12. The sentence imposed by the trial court is within the statutory guidelines. At both the sentencing hearing and in the sentencing entry, the court noted: the injury to the victim was worsened due to his physical condition; the victim suffered serious physical harm, resulting in ICU

hospitalization; appellant has an extensive history of misdemeanor convictions; appellant failed to respond to past sanctions; and appellant was non-compliant with bond conditions.

{¶52} Appellant argues the minimum sanctions to achieve the purpose of R.C. 2929.11 contradicted the imposed sentence and that the trial court failed to adequately consider mitigating factors such as appellant's lack of previous felony convictions and his early exposure to substance abuse. Appellant contends he should have been placed in a rehabilitative setting in which he could obtain substance abuse treatment. While appellant may disagree with the weight given to the R.C. 2929.11 and R.C. 2929.12 factors by the trial judge, we have no basis for concluding the sentence in the instant case is clearly and convincingly contrary to law. The record demonstrates the trial court received and reviewed the presentence investigation report, and heard statements from the prosecutor, defense counsel, and appellant himself. In addition, both at the sentencing hearing and in the sentencing entry, the trial court specifically noted several factors considered in fashioning appellant's sentence, as described above.

{¶53} We conclude the trial court did not commit error when it sentenced appellant. Upon review, we find the trial court's sentencing complies with applicable rules and sentencing statutes. Appellant's second assignment of error is overruled.

{¶54} Based on the foregoing, appellant's assignments of error are overruled. The judgment of the Tuscarawas County Court of Common Pleas is affirmed.

By Popham, P. J.,

Baldwin, J., and

Gormley, J., concur